Mr. Justice Cox
delivered the opinion of the Court:
This litigation arose out of the following condition of affairs: A long time ago Richard M. Blatchford, who was the father and testator of the present defendant, purchased the acceptances of the firm of Hoyt, Sprague & Co., of New York, before maturity, to the amount of some f33,000, the last of which is said to have matured in the year 1874.
In 1875, Blatchford brought a suit in New York against the surviving members of that firm, Amasa Sprague, William Sprague, and the other parties, named Knight, Greene, Gallup and Hoyt, but personal service was had upon Gallup only, and in April, 1875, a special judgment, as it was called, was rendered in pursuance of the Statutes of New York. That was a personal judgment against Gallup, who had been served with process, a judgment which could be executed also against the partnership property, wherever it could be taken, but which could not have been enforced against the private property of the parties who had not *470 been served with, process. Judgment was then rendered for $41,000 and some cents.
Blatchford died in September, 1875. His son, the present defendant, and another -person, who has since died, were appointed his executors In April, 1875, the ■ Berkshire Woolen Company, a judgment creditor of Hoyt, Sprague & Company, brought a general creditors’ suit in New York against one Augustus D. Juilliard, who had been appointed receiver of the effects of Hoyt, Sprague & Co. in another suit between the surviving partners of that firm and the representative of a deceased partner. In that bill they prayed that this receiver be made receiver for the benefit of the creditors of the firm, and an attempt was made-to make all the surviving members of that firm parties to the suit.
It is one of the controverted questions of fact in this case whether William Sprague was ever rightfully represented by counsel in that case so as to be bound by any decree passed in it. At all events, the creditors of the firm were invited to present their claims and they were audited, and among the claims so audited was that of the deceased, Bichard M. Blatchford, and a decree was finally passed apportioning to him his pro rata share of the assets in the hands of the receiver. That decree was passed June 20, 1876. The nature of that decree and the effect of .it is another one of the controverted questions in this case. '
’ On the 14th of May, 1878, the defendant and his co-executor, then living, brought suit on the common law side of this Court against William Sprague, one of the surviving partners, and issued an attachment against his property in this city on the ground of his non-residence. That attachment was levied upon the property. In the declaration in that case there are several counts. The first one is upon the decree in the Juilliard suit of June 20, 1876, treating that as a personal judgment against Sprague. The other counts are for money had and received, and money loaned,' and money due on an account stated, etc. The object of *471 that suit, it is said in the suit now befoi’e us, was to test the validity of two certain deeds which were executed by William Sprague and the other surviving members of the firm which I have named, to Zechariah Chafee, in trust.
■Nothing further was done in that attachment proceeding or the suit; the reason assigned for which is, that similar suits were pending in certain Courts at the North and the parties desired to wait the result of that litigation.
On the 11th of October, 1884, Chafee files his bill in this Court against the defendant Blatchford, and the prayer of that bill is that the attachment be declared null and void, and that the defendants be perpetually restrained from further proceedings thereunder and the plaintiff be allowed by decree of the Court to sell the real estate under the powers contained in the deeds to him, free and clear of the cloud created by said attachment, or that the_same be sold under the order of the Court, etc.
Of course, the first question which presents itself to us is, what title is exhibited by Chafee claiming under these several deeds. There are two deeds which were • executed to him, the first one being dated November 1, 1873, and the parties to it are the A. & W. Sprague Manufacturing Company, “a corporation created by the General Assembly of the State of Bhode Island and transacting business in the City of Providence,” William Sprague, of South Kingstown, Amasa Sprague, of Cranston, Mary Sprague, widow of William Sprague, deceased, of said Providence, all in said State, and / the said Amasa Sprague and William Sprague'as co-partners, doing business under the firm of A. & W. Sprague, all parties of the first part, and Zechariah Chafee, of said Providence, as party of the second part.
The deed recites an indebtedness amounting in the aggregate to about the sum of $14,000,000, which the parties are desirous of funding and securing, and it goes on further to recite that the parties “have executed their 16,500 negotiable promissory notes, all bearing even date with *472 these presents, and made payable to the order of said A. & W. Sprague, and by them indorsed, payable three years from January 1, 1874, with interest from January 1, 1874, payable semi-annually at the rate of 7y,0 per centum per annum till said principal sum is paid, whether at or after maturity, and all installments of interest in arrear to bear interest at the rate aforesaid till paid,” etc., which notes are to be passed to creditors who may come in within nine months and take the benefit of the deed.
This deed conveys “all the property, real, personal, and mixed, not' exempt from attachment by law, which the parties of the first part, or any or either of them, have or hold in” certain towns in the State of Rhode Island, in the State of Massachusetts, in the State of Maine, in the State of New Hampshire, in the State of South Carolina, in the City of Washington, D. C., and also in Connecticut, naming them. It provides, further, that the trustee may at any time, even before default, as well as after, enter upon the estates and take full and absolute possession and control of the same, “and in their or his discretion to continue to run and operate, or to close the mills or print works of said manufacturing company, or any or either of them, as said trustees or trustee for the time being shall deem for the best interests of the creditors.” And in case of default in the payment of the notes or the interest due, then the trustees “may in their or his discretion, and upon the request in writing of the holders of one fifth in amount of the notes then issued and outstanding under these presents,” enter upon and sell the property, etc., and when the sale takes place, they are out of the proceeds thereof, to provide for the payment of expenses, including the expenses of carrying on the business “or in the execution of any other of the trusts hereby created.” Secondly, “to apply the residue to the payment of all debts and liabilities which shall be brought in under these presents and remain oustanding as aforesaid,” accounting to the parties of the first part, etc., *473 “ for the surplus, if any, that may remain after the full payment thereof.”
Another provision is, that “no trustee under these presents shall he answerable or accountable for any loss which may happen to said trust estate or property, unless the same shall happen by his own neglect or default:”
On the 6th of April, 1874, another deed was made by William Sprague alone, in which he recites that he is indebted for divers sums of money, and desires to appropriate his estate and effects to the payment of the same, and therefore conveys to the said Ohafee “all his right, title and interest, legal or equitable in or to all the property of the grantor described or referred to in the trust deed of mortgage dated on the first day of November, 1873, * * * to have and to hold the same in trust, to sell the same at public or private sale and convert the same into money and the proceeds thereof to apply, first, to the payment in full, if sufficient, otherwise ratably, of all the claims against the said William Sprague provided for in said trust deed of mortgage of November 1, 1873, which have been, or shall within nine months from November 1, 1873, be brought in and extended for the term of time provided in said trust mortgage,” And the trustee is further authorized “To run said mills and print works or either or any of them, or to allow the grantor to run the same or any of them, or to allow the grantor to run the same or any part thereof, if for the best interest of the creditors; the profits of the same being receivable by the aforesaid grantee for the purpose aforesaid; and in case the same are thus run by him or otherwise, he shall not he liable personally for the expenses or losses arising therefrom, but the same shall be chargeable to the trust fund vested in him.”
The first objection made on the part of the defendant to the title exhibited on these deeds is that the language is not definite and specific enough to embrace the property of the Spragues in this District. The language is: “All the *474 property, real, personal and mixed, not exempt from attachment by law, which the parties of the first part, or any or either of them, have and hold in the following city and towns in the State of Rhode Island * * * and in the City of Washington, in the District of Columbia.”
We have no doubt that the language is comprehensive enough to embrace the property here.
The next question is whether these deeds are fraudulent on their face as against creditors. We have no doubt from what appears in the record here that at the time of the execution of the deeds, the grantors therein were in embarrassed, if not insolvent, circumstances; in fact, the bill itself recites that at that time, the A. & W. Sprague Manufacturing Company, the company of which William Sprague was a member, “found itself unable, in consequence of the financial embarrassment then overspreading the country, to meet its indebtedness.” We have no doubt, either, that at that time, Blatchford was a creditor, so that he was one of those persons as to whom this deed was fraudulent and void, if it was such a deed as a debtor in embarrassed circumstances has no right to execute.
The question of the validity of these deeds has been before several Courts and has been decided in different ways. It appeared first in the case of De Wolf vs. Sprague Manufacturing Company, reported in 49 Conn., 282. The Court of last resort of that State held the deeds to be fraudulent and void and in the United States District Court for Connecticut a similar decision was rendered by Mr. Justice Shipman. After that, the question came before the court of last resort of the State of Rhode Island and was discussed in the case of Austin vs. Sprague Manufacturing Co., 14 R. I., 464, and that Court upheld the deed which was executed in 1873, and which has been called a deed of trust or mortgage. The second, which was more in form like an assignment, was not disposed of in that case. The United *475 States Court in that State also followed the ruling of the State Court.
A case has been cited from 71 Maine, but upon examining that case we find that it held, simply, that a creditor in Rhode Island who assented to the deed and took the benefit of its provisions, could not go into the State of Maine and there impeach it as fraudulent. Therefore it does not touch the question now before us. -
Now, viewing this question in the light of general principles, and unaffected by the local legislation or local decisions, it seems to us, that the reasoning of the Court in Connecticut is more satisfactory and entitled to the greater weight. The common sense of the matter may be expressed, we think, in a very few words. A man in debt has a right to prefer any creditor or creditors and he may execute a mortgage to secure a debt of a certain amount, payable at a certain time. When he does that, he has a well defined residuary interest in himself, in the shape of an equity of redemption, to which his creditors may have recourse. But if such aconveyancé covers up and screens the equity of redemption and puts obstructions in the way of access to it, by his unsecured creditors, that is sufficient at once to visit the instrument with condemnation as tending to hinder, delay, and defraud his creditors.
Looking at the provisions of this conveyance we find them very peculiar. Here is a deed which purports to be a deed of trust or mortgage. It is a blanket mortgage which covers everything which the grantors own everywhere, and the whole indebtedness bovers every piece of property, in every jurisdiction. The equity of redemption in any one part of that property, any specific part of it, is absolutely valueless, because it is subject to incumbrances to the amount of four or eight million dollars, the amount of claims which were funded and are represented by the notes issued under this deed of trust. Nobody would purchase an equity of redemption in any specific part of this *476 property, subject to such an incumbrance as that; so that no creditor could have any relief through a sale of the mere equity of redemption in any part of this property. There is no manner in which a creditor could have relief except by having the whole property sold free of incumbrance, the debts paid and the surplus appropriated to the satisfaction of unsecured debts. But if this deed stands good, this property never can be sold except at the option of 20 per cent, in amount of the creditors who have chosen to come in under its provisions.
It provides that notes shall be issued to the creditors who assent to this arrangement, bearing interest at 7-^- per cent., payable semi-annually, the interest to be compounded semiannually when the installment is in arrears. A sale can be made only in case one-fifth of the creditors shall request it in writing, after the maturity of these notes, which run three years. So that these creditors have a pretty good thing of it, or may have, if the management of that property results in the payment of 7-& per cent, interest per annum, and they may let it run on indefinitely. Four-fifths of the creditors, or rather creditors representing debts amounting to a single dollar in excess of four-fifths of this indebtedness, may protract this arrangement as long as they choose. It is at their option, and they may keep all other creditors, not assenting, out of all access to this residuary interest. This is an artificial obstruction added to the intrinsic difficulty of getting at property scattered through so many jurisdictions.
But that is not all. It is provided that the trustee may carry on the business, and shall not be responsible for any losses; the losses, in other words, will come out of the estate. So that not only is the equity of redemption covered up and placed beyond the reach of the creditors, but it is also exposed to the risks of a continuation of this business. It seems to be a very cunningly devised contrivance for enab *477 ling the creditor in person, or his trustees, to conduct the business and keep the creditors off, so that he may have the chance at some time in the future of retrieving his fortunes, while at the same time the creditors are exposed to the risk of further loss and disaster. I think the statement is made that the running of the mills did continue for eight years, and there was nothing to prevent their going on indefinitely if it was successful and if. a trifle more in amount than four-fifths of the creditors chose to continue. The consequence is, that the unsecured creditors are completely under their control, and if they have any remedy at all it is postponed indefinitely by those disposed to continue the risk, and vanishes into thin air. That is the case if we treat this as a mortgage. We can hardly imagine an instrument which can more effectually hinder and delay these unsecured creditors who did not come in under the deed and who desire to have a prompt collection of their debts.
But if we look upon it'as an assignment, and especially if we consider it in connection with the'last deed of 1874, which was, in form, an assignment and which simply conveys the property on the same trusts, it is still more manifestly vicious, because of the enforced conditions of delay which are imposed on the creditors who come in to get the benefit of these deeds. They are not to have the benefit of the property at all, unless they will at once consent to a delay of three years. All the creditors who do not assent to the conditions are excluded entirely, and then there is a reservation of the surplus for the benefit of the grantor himself. These are features of an assignment, made professedly for the benefit of creditors, which condemn it as fraudulent and void.
Now, this is the view which we take as to the character of these deeds, looking at them simply in the light of general principles, and we find that the decisions of the highest Court of Connecticut and of the District Court of the United *478 States in that State concur with us in that view. I read an extract from the opinion of. the Court of Errors of Connecticut. That Court said:
“But the deed (of November 1, 1873) contains other features which impart to it a fraudulent character, and render it void as a mortgage of real estate in this State as against non-assenting creditors. It empowers the defendant, Chafee, as trustee, and any person who may succeed him in the trust, under its provisions, to run and operate the mills and print works of the A. & W. Sprague Manufacturing Co. at the expense of this trust estate, and for the benefit of A. & W. Sprague, Amasa Sprague and William Sprague, and of their creditors as well as of the Manufacturing Company and their creditors, for a period of time limited only by the trustee’s discretion, unless one-fifth in amount of the holders of the notes issued and outstanding under the deed intervene, and request him in writing to dispose by sale of the estates. The effect, therefore, of this power, if executed, and losses be sustained in its execution, would be to enlarge the incumbrance upon the trust estates and diminish the value of the only property or interest to which the non-assenting creditors could resort to obtain satisfaction of their claims — that is, the equity of redemption in the mortgaged premises.”
“ If profits should be made in the execution of the power, they would inure to the benefit of the assenting creditors of the Spragues, as well as of the assenting creditors of the company. The non-assenting creditors would thus be hindered, delayed and defrauded.”
In the United States District Court, Judge Shipman says :
“ The mortgage deed, and the assignment, taken together, attempt to convey the entire title of the grantors in the conveyed property to a trustee for the benefit of the creditors of ■ the corporation, and of Amasa and William *479 Sprague, individually and as a corpartnership, and of the other stockholders, giving a preference to those who should, within nine months from November 1, 1873, extend the time for the payment of their debts for three years from January 1, 1874. The trustee is authorized to run either or all of the mills and print works which belonged to the corporation, or to allow the grantor to run the same, the profits being receivable by the grantee, and the expenses to be chargeable to the trust fund. Thus the property which was a fund for the payment of debts, having been placed beyond the reach of non-assenting creditors, is further subjected for an indefinite time to the hazard of the losses resulting from the running of the mills, and the manufacturing expenses are chargeable to the entire fund, as well that derived from the individual property of the Spragues as from the corporate property. The intent of the mortgage and the assignments was, not only by a set of conveyances, professedly for the benefit of all the creditors, to put the entire estate into the hands of a trustee for a period not necessarily definite and determined, but also to subject the property against the will of non-assenting creditors, for a like indefinite time, to the hazards of a business exceedingly extensive, and of uncertain pecuniary profit. “No debtor has a right thus to postpone or put in peril the rights of his creditors without their consent and a conveyance which attempts so to do, or which is executed for the purpose of depriving creditors of their right to enforce their just claims against the property of their debtor by placing it beyond their reach or control for an unlimited, indefinite or uncertain period, is, in conscience, as well as in law, fraudulent.”
He then cites the DeWolf Case and continues:
“This legally fraudulent character is apparent upon the face of the deeds, and parol evidence is of no avail that both the grantors and the majority of the creditors thought that *480 the arrangement was the best for the interest of all the creditors, and that the experiment would be a success, because neither the grantors nor a majority of the creditors have a legal right in an assignment for the benefit of all the creditors, or to subject the property of the assignor for an indefinite time to the hazards of enterprises which are not only far more extensive than those incidental to the winding up of the business, but are a continuation of the business of the debtors to its full extent. The cases which justify the carrying on of a manufacturing business by a trustee until the stock is exhausted, or the purchase of new materials to enable the stock to be worked up, have no analogy to this case in which the deeds contemplated the carrying on by the trustee of a vast business. Notwithstanding the motive of the debtors and the assenting creditors was not tinged with bad faith, the deeds were of such a character that the law pronounces them to be fraudulent towards non-assenting creditors, and refuses to lend its aid to the coercion which would compel them to enter into a business which they disapproved.”
In answer to this, however, it is claimed on the part of the complainant, that these deeds are a Rhode Island transaction, and that their validity is to be determined by the law of that State as expounded by its highest tribunal, and inasmuch as they have been sustained by the highest court of that State, they must be regarded everywhere else as valid, and some authorities are cited upon that question.
I think, however, we are relieved from the necessity of deciding that point because it is founded on a mistake of fact, and that, so far as the property in this District is con-concerned, we have to do with a District of Columbia transaction. In respect to these deeds we find that they were first acknowledged in Rhode Island. But there was no certificate attached to the deeds, that the officers, who *481 took the ackowledgments were competent to do so. Our statute provides that the acknowledgment of a deed may be made before any of certain named officers, among whom is a notary public, but it is further provided, that in the case of any acknowledgment made beyond the limits of the District, the certificate of the same shall be accompanied by a certificate of the register, clerk or other public officer, having cognizance of the fact, that the officer who takes the acknowledgment was, at the date of the acknowledgment, in fact the officer he purported to be.
Then it was further provided by the Act of April 29, 1878 (20 Stat. at L., 39), that “All deeds, deeds of trust, mortgages, conveyances, covenants, agreements, or any instrument of writing which, by law, are entitled to be recorded in the office of the Recorder of Deeds, shall'take effect and be valid as to creditors and as to subsequent purchasers for valuable consideration without notice, from the time when such deed, deed of trust, mortgage, conveyance, covenant, agreement or instrument in writing shall, after having been acknowledged, proved or certified, as the case may be, be delivered to the Recorder of Deeds for record, and from that time only.”
The recorder is only authorized to record deeds acknowledged in the manner prescribed by law. As this deed was acknowledged in the first instance in the State of Rhode Island, unaccompanied with the certificate of the proper officer, it could not have been, under this law, admitted to record in this District, and not being an instrument which the law authorized to be recorded, it would not have protected this property against creditors, and for that very reason Mr. Sprague came on here. immediately after and re-executed the deeds in this District. The first deed was executed by him on December 1,1873, in Providence, R. I., and on December 4, in Washington. The second deed was executed April 6, 1874, in Providence, and April 15, in Washington, and the execution here is the only execution *482 of the deeds which gives them any operation here at all, as against creditors, and which, if the deeds had been in other ¿respects valid, would have protected the property from attaching creditors. So that we feel at liberty to apply to these deeds all those general principles on the subject of fraudulent deeds which we should hold applicable to deeds executed by a resident here in this District, and do not feel hampered by the decision of the courts of Rhode Island. In that view of the case, we have then a party applying to us for affirmative relief, claiming title under deeds which, in our judgment, are void as against creditors, and therefore not valid as against this defendant, representing the claim of Blatchford, who was a creditor at the time these were executed.
But there is another position taken on the part of the complainant, viz., that this debt of Blatchford is barred by the Statute of Limitations, and he is no longer, therefore, a creditor who is hindered and delayed from collecting his debt by the operation of the deed. The deeds are dated respectively in 1873 and 1874. The last of the acceptances, it is said in one of the briefs, matured in 1874. This suit (the common law suit) was not brought until 1878, just one year later than the expiration of the statutory period. Now this position is only good upon the theory that the debt of Blatchford has ceased to be a debt, by the mere lapse of time; and that is entirely at war with the settled rules of law relating to the Statute of Limitations. I think it is sufficient to state it to insure its rejection even by counsel representing the complainant. The defense of limitations, as we all know, is one which it is the privilege of the debtor to make, or not, as he pleases. The law does not make it for him, nor does the law pronounce any debt extinguished by virtue, merely, of the lapse of the statutory period. The debt continues the same and may be collected or reduced to judgment unless the defense of the Statute of Limitations *483 be interposed; and if the debt can be collected in any other way, than by an action barred by the statute, as by realizing from collateral securities, that may be done.
Now, so far as we know or can anticipate, the.plaintiff in the law suit may obtain personal service on William Sprague, or Sprague himself may choose to appear and allow judgment to go by default, or may forbear to plead the Statute of Limitations. Nobody can plead it for him. Chafee cannot appear in that suit and plead. It is a controverted question whether he may appear in the attachment proceeding and move to quash it on the ground that it is levied on other property than that of the defendant in the suit, but certainly he could not plead the Statute of Limitations to the action. Nobody could plead that except Sprague himself, and we cannot assume any more that he will than that he will not.
This deed is none the less a hindrance and obstruction to this creditor because another hindrance or obstruction may now, in consequence of the lapse of time, be interposed by the debtor in the shape of a plea of limitations. The mere possibility that he may avail himself of the statute does not render the deed any the less a hindrance or obstruction to the collection of this debt. And again, if this deed was fraudulent at the time when it was executed, as against Blatcliford, how can it come, through lapse of time, to be valid? If Blatchford chooses to bring suit against Chafee, the latter, in defense, may be able to avail himself of the lapse of time. But the deeds cannot become valid by the lapse of time, if void in the first instance, so as to give substantive rights and put him in the attitude of a claimant entitled to affirmative relief.
This, therefore, seems to us to dispose of the question of limitations, and it really does not figure in this case at all in our judgment.
It therefore remains for us to announce the result we *484 have reached, and that is, that this complainant is not entitled to relief and we must dismiss the bill. In doing that, we do not express, and are not called upon to express, any opinion upon the question whether the decree against Julliard upon which the complainant in the law suit relied, was a decree in personam against Sprague, or whether the defendant must rely upon his original cause of action. We are not called upon to express any opinion as to the regularity of the attachment or the mode in which it may be resisted or set aside.

All we profess to do now is to deny relief and dismiss the bill on the ground that the title deeds on which the claim for relief is founded are void and fraudulent as against the defendant, as one of the creditors of Sprague.